[Civ. No. 12421.   Second Appellate District, Division Two.—August 9, 1940.]

H. A. BARDEEN, Respondent, v. COMMANDER OIL COMPANY et al., Appellants.

Don S. Irwin and Andrews, Blanche & Kline for Appellants.

Oliver O. Clark for Respondent.

MOORE, P. J.—Plaintiff having recovered judgment against defendant in the sum of $10,211.67 on a contractual obligation for the payment of oil bonus and royalties, defendant appeals. Inasmuch as the primary ground relied upon by defendant for a reversal is the claim of insufficiency of the evidence to support the judgment it will be necessary to review the history of the transactions out of which the controversy arose.

In May, 1928, the owners of certain oil lands in Ventura County leased three parcels thereof (parcels 2, 3 and 4) to the Reservoir Hill Gasoline Company, hereinafter referred to as Reservoir Company, which was a subsidiary of the Rio Grande Oil Company, at a monthly rental of $150. September, 1929, the Reservoir Company assigned its lease to one Thornton contemporaneously with an agreement between Thornton and said Reservoir Company whereby Thornton agreed to commence drilling of a well within 120 days and to

continue the drilling to a depth of 3,500 feet unless oil in commercial quantities should be encountered at a lesser depth. The contract provided a graduated scale for the payment of the bonus whereby, if the well produced more than 50 barrels and less than 100 barrels per day the first 30 days of production, Thornton might retain the lands by paying $25,000 and in the event the well should produce 100 barrels and less than 250 barrels per day during said first 30 days of production, Thornton was obligated to pay the Reservoir Oil Company $50,000 out of twenty-five per cent of the total production from such well or other wells drilled. Prior to July 2, 1930, Thornton commenced the drilling of a well on said parcel 2 and on said date no oil having been encountered and his treasury having been depleted, he employed the Rio Grande Oil Company to drill a well 3,500 feet or to a commercial well. The production of a commercial well by said contract was fixed at double the minimum quantity of production as that provided for in the original lease of the Reservoir Company. The Rio Grande Oil Company, having suffered vicissitudes in its attempt to fulfill its contract, finally placed a well on production at a depth of not to exceed 960 feet, at which depth oil was first discovered. A pump was installed and the production of oil began on the 7th day of November, 1930, and continued until December 14, 1930, with an average daily production of 37 barrels. This production not being equal to that required by the terms of the drilling contract, the Rio Grande continued sinking a well until February 14, 1931, when the well was again placed on production and continued to produce until February 26, 1931, when the well was shut down for lack of sufficient storage facilities. In the meantime said Thornton had surrendered to the Reservoir Company the leases on parcels 3 and 4 and on February 7, 1931, just before the well was placed on production the second time, he assigned his interest in the lease to one Ethridge who assumed and agreed to pay such bonus as might thereafter be fixed on the basis of production developed from the well. Ethridge subsequently on August 24, 1931, assigned the lease on said parcel 2 to the defendant herein.

While the production of oil was temporarily discontinued, on the 26th day of February, 1931, the said Ethridge and the said Reservoir Company orally agreed that the production of the well as proved between the 14th and the 26th day of

February, was sufficient in volume to enable them to determine that the capacity of the well was in excess of 100 barrels per day and less than 250 barrels per day, notwithstanding the fact that the full 30 day production test had not been made and could not be made because of the lack of storage facilities and that the bonus of $50,000 provided for in the drilling contract should thereafter be payable out of 25 per cent of the total oil produced. Intermittent production continued thereafter until April, 1932, during which period 25 per cent of the production was paid to the Reservoir Company by said Ethridge on account of obligation arising from the drilling contract.

During the four years prior to the commencement of this action the defendant produced oil from the well in the amount of $10,503.61. During the same period the Bardeen Petroleum Company, Ltd., and its trustee in bankruptcy produced oil from the same premises by means of two slant wells which were drilled from the adjoining lands into said parcel 2. For this oil which was wrongfully taken, defendant, being rightfully entitled thereto, had been compensated in the sum of $25,475.92. It was for the recovery of 25 per cent of the total amount of oil so produced from the premises that plaintiff brought this action.

In support of its contention that the proof is insufficient to support the judgment, defendant argues that the evidence shows that the only 30 day production test ever made was that recorded between November 7 and December 14, 1930, when the average production was only 37 barrels per day and that since that 30 day test showed less than 50 barrels per day capacity, no bonus obligation arose under the drilling contract and certainly no obligation could arise whereby defendant should pay 25 per cent of the production upon the basis of 100 barrels per day capacity. While the evidence is conflicting as to the results of the operation of the well during November and December, 1930, there is some evidence beyond question that a production test was made during that period although it was of a temporary character for the purpose of determining the kind of fluid in the hole and to show that the well was not properly conditioned for the purpose of making an adequate production test. Moreover, the evidence shows that the pumping operations of November and December, 1930, were not carried out in the

manner required by the drilling contract for a production test, that is to say "in accordance with the best usages and customs in vogue in oil fields in the state of California". Inasmuch as the record shows no finding of fact as to the character of the pumping operations during the last-mentioned period, we must assume that the trial court resolved the conflict in the evidence and impliedly found that no production test was made in November and December, 1930. There is also other evidence in the record to justify this finding. Such a finding based upon sufficient evidence, though contradicted, will not be disturbed. (*Patten & Davies Lumber Co.* v. *McConville*, 219 Cal. 161 [25 Pac. (2d) 429].)

The court found that the 30 day production test of the contract was waived by defendant's predecessor Ethridge. This finding is based primarily upon the fact that, when Ethridge and the said Reservoir Company discovered that the storage facilities were inadequate to carry out said 30 day production test, they agreed: (1) That the production from February 14th to February 26th, was sufficient to justify the determination; (2) that the potential productivity of the well would exceed 100 barrels per day and not over 250 barrels per day; (3) that by reason of the inadequacy of storage facilities, the well should be shut down rather than keep it on production for a full 30 day period; and (4) that consequently the $50,000 bonus provided for in the Thornton-Reservoir Company contract of September, 1929, should thereafter be payable. Said agreement between Ethridge and said Reservoir Company is corroborated by the following:

(1) One Morgan, vice-president of the Rio Grande Oil Company, and agent for the Reservoir Company, testified that at about the time of the shutdown in February, 1931, he had a conversation with Ethridge in which Ethridge congratulated him upon production of the well and upon the fact that the Morgan's prediction of a 200 barrel daily production had been justified by the actual results from the well; and that Ethridge stated to him that this would bring in money under the contract; that the $50,000 bonus out of 25 per cent of the oil would be payable; that he, Ethridge, was interested in the fact that it might be possible for his side organization to pay the bonus out of production rather than in cash; and that whereas the obligation arising out of the production of 100 barrels daily or less would have

required the payment of a bonus to the Reservoir Company in cash, yet by reason of the stipulated production of more than 100 barrels daily, they "could share the 50,000 out of the 25 per cent of the oil as would be produced from the well".

(2) Morgan's narrative of this conversation with Ethridge is borne out by the fact that 25 per cent of the value of the oil produced was actually paid to the Reservoir Company until August, 1931, by Ethridge and thereafter by defendant until April, 1932.

(3) Furthermore, after April, 1932, Mr. Snow, president of defendant company, in a number of conversations with the same Morgan, discussed the possibility of securing a waiver of this bonus obligation. In one of these conversations, he stated "that he was unable to operate the property, especially unable to drill further wells under the load of the 25 per cent gross royalty which he was obliged to pay the Reservoir Gasoline Company from the production" and that he was unable to finance further operations because of the 25 per cent oil bonus payable to the Reservoir Company.

(4) There was no denial of liability during the six years following.

In view of this evidence and of the fact that after payments had been made, no denial of liability was suggested during said six years, we must conclude that the trial court had ample evidence upon which to base the finding and the judgment.

Defendant contends that the court erred in admitting Morgan's said testimony of the Ethridge conversation over objection. It argues that since Ethridge was only one of several associates interested, he had no authority to bind his associates. But it is to be remembered that Thornton assigned the leasehold to Ethridge alone, which entitled Ethridge to speak as the owner of the property. Under the circumstances it was unnecessary for plaintiff, in laying the foundation for the admission of the Ethridge conversation, to do more than show that the conversation was with Ethridge in whom the record title of the leasehold was vested. Said testimony could be overcome by proof that Ethridge was actually representing certain principals who did not appear of record in the transaction and that he was without authority to speak for them but no such evidence was offered.

■ It is further objected that the testimony of Morgan was inadmissible by reason of the fact that its effect was to alter the terms of a written contract by an unexecuted oral agreement. (Civ. Code, sec. 1698.) However, its effect did not vary the terms of the writing; *it merely waived full performance of one of the provisions of said writing after the drilling of the well provided thereby to be done had been completed.* Such a waiver may be effected by parol evidence. (*Miller & Lux, Inc.,* v. *San Joaquin Light etc. Corp.,* 120 Cal. App. 589 [8 Pac. (2d) 560].)

■ Finally defendant contends that Morgan's testimony was inadmissible because of the fact that Ethridge had deceased prior to the trial and that evidence of his declarations is of a weak and unsatisfactory character. However, its weakness is no test of its admissibility. (Code Civ. Proc., sec. 1870, subd. 4.) If it had stood alone, it might have been insufficient to carry the burden but taken in connection with the other factors above enumerated, it is competent for whatever it is worth. The trial court presumably accorded some weight to the testimony and if not there was sufficient evidence to support the court's finding without it.

■ Finally the assignment that error was committed in receiving in evidence certain telephone and telegraphic reports is without merit. They consisted of daily records of the well's progress and production. The purpose of their introduction was to prove the quantity of oil produced from February 15 to February 26, 1931, and to demonstrate that the necessity of closing down the pump was the lack of storage facilities. But the court specifically found that there was no evidence to prove what the production from the well would have been during the first 30 days after the well was placed on production "if production of oil from said well had not been discontinued before the expiration of said 30 day period".

In view of said finding, it is clear that the court did not accept said records as proof of the production capacity of the well. Therefore, if the court's action was error, it was clearly not prejudicial.

The judgment is affirmed.

McComb, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on September 5, 1940, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 7, 1940.